ROAN®, Judge.
The court is of opinion that the copy of the deed of bargain and sale of the 8th of February 1820, mentioned in the first bill of exceptions, ought not to have been excluded by the general court from going in evidence to the Jury. — According to numerous and well established English decisions, that copy was good evidence; and this upon the true construction of the statute of 27th H. 8th chap. 16, and in exclusion of the statute of Anne. It is so evidence, Decause where a deed of bargain and sale is inrolled pursuant to the first mentioned statute, that inrolment is a record so that a copy of it may be read in evidence. (14 Vin. 44S and other cases.) It ought also to be read in evidence, for the *917 further reason, that as the law has appointed them to be public acts, and reposed a confidence in the recording- officer, the copies of such public acts, shall be like other public acts, good evidence. (Gilb.’-L. Evidence 99 and other authorities.) This which is the established law of England holds a fortiori in relation to this country. By the English statute, the acknowledgment by the grantor might be before two Justices in the country: whereas until lately, our deeds were required to be acknowledged r r proved in open court. The distinction is not unimportant: and has been sanctioned by the most respectable judicial '^opinions in this country. In the case of Lee v. Tapscott, 2 Wash. 281, President Pendleton emphatically allowed a copy of a patent recorded in a county court to be evidence, and preferred it to a simple registration; for the important reason, that the clerk acts under the superintendance of a court of justice; which court would prevent erased or improper deeds from being thrown into the public records. Under our laws, having this important provision and check existing in them, this usage (if you please,) as to the receipt of copies, in evidence, grew up, ■and came to maturity. And although that system has been lately changed, so as to admit deeds to record, on the certificate of two Justices only, that usage ought not to be considered as affected. The system is, even now, on as good a footing as to the confidence due to the officers receiving the acknowledgment, as is that in England. The sjstems are now in this respect precisely the same. If therefore the decisions •of the English courts legalized copies as evidence under their statute, those decisions equally apply, even to our modern system •on this subject. At the same time, that construction more forcibly applies to the stronger case of deeds acknowledged or proved before a court of Justice, tinder which our rule was established: and it was the intention of the legislature, in making the alteration, not to change the rule in relation to the point of evidence, but merely to substitute a more convenient mode, for the accommodation of the people.
These decisions of the English courts, although never brought directly before the supreme court have received the countenance of that court in sundry instances. There are several decisions in that court which cannot be reconciled to any other idea. As cases of this character, we will mention those of Maxwell v. Light, 1st Call 120; Whitaker v. M’Ilhany, 4th Munford 310; Turner v. Stip, 1st Wash. 319, and the before mentioned case of Lee v. Tapscott.
*Owing to the English decisions before mentioned and to these corroborations of them by our own courts, the position that a copy of a recorded deed may be given in evidence, has grown into a general usage in this country. But this point does not rest upon mere usage. It is as much established as a principle of evidence, as any other to be found in the books. If, however, it rested only on mere usage, and had not this last and greatest sanction, this court would be disposed to respect that usage. — While it would hold itself at liberty, as was done in the case of Tompkies v. Downman, to depart from a usage, which was in conflict with the actual expressions of a statute, and perhaps in opposition to great principles; it would respect an usage which was not confronted by such powerful objections. It would respect it, as the court of appeals did, among others, in the cases of Hudson v. Johnson, 1st Wash. 10, —Jones v. Logwood, 1st Wash. 42, and Branch v. Burnley, 1st Call 147. It would, especially, hesitate to repeal an usage, which has been so general and universal, as that its reversal would inundate this country with litigation, and lay the foundation of innumerable appeals and law suits. The court sees but little danger in adhering to this usage. — While, on the one hand, there is but little utility in exhibiting original papers which a court or confidential commissioners have already passed on as genuine, and which the party is concluded from denying to be his deed, by the acknowledgment and recording thereof. A copy is not without it preference, in some sense over the original. It lays a veto upon the grantee, as to altering or erasing that deed, from and after the time of the acknowledgment. Such a subsequent alteration or erasure would be controlled and corrected by the attested copy, previously taken, by a sworn officer. Nothing however now said by the court, is to be construed to impair the right of a party, whatever it may be, to call for the introduction of an original deed, instead of a copy.
*The counsel for the appellees, foreseeing that this point might be decided against them, have taken the ground, that the original deed itself, if before the court, could not be read against their clients: nay, they have taken the yet bolder and stronger ground of saying, that the deed could not have been read even against John Preston. As against John Preston himself, it was propérly answered, that' the deed was signed, sealed and acknowledged, by him. It is therefore emphatically his deed. It relates also to the subject now in controversy. It admits that the penalty of the bond now sued on, may have been incurred, which carries with it an admission that the defalcation happened in the year 1819, and it provides for the indemnification of these appellees, therefor. As this deed binds John Preston, and acknowledges the material matters in controversy in this motion, it is of no account, that there are other books and evidence going to prove the same facts. It is the right of suitors in courts of justice to exhibit as many evidences on the same point, if legal and relevant, as they please. The court cannot cut them out of this privilege. It cannot compel them, at its pleasure, to rely upon a single document or witness. Had this deed been received in evidence, the Jury might still have rendered a verdict for the appellant, by virtue of its provisions, notwithstanding the opinion given against him by the general court, touching the conclusiveness of the books, offered as evidence; and thus this appeal would have been prevented. It might have been evidence, both to out *918 weigh the appellees’ parol evidence, then sanctioned by the opinion of the general court, and to confirm or supply the statements in the books of the treasury. It might have had that effect, because it speaks, pretty explicitly as to the time of the defalcation, and might thus, as to him, have worked an estoppel.
It does this, by admitting that the penalty of the bond before us, may have been incurred, which cannot be, unless *the embezzlement happened in the year 1819. Again, it is of no account, at least as against John Preston, that the acknowledgments in this deed were made after the expiration of his office. Parties may bind themselves by their confessions even up to the time of trial.
As for the sureties, (the appellees,) it will be seen, in an after part of this opinion, that they must stand on a common ground with their principal. Yet the deed is also binding as to them. It is so binding, because it is made, emphatically, for their benefit, and must be considered as made at their instance. The case is not altered by the mere intervention of trustees. The sureties themselves are the real grantees; and, besides, the deed has been accepted by them, and acted under for their benefit. Por any thing known to the court, the proceeds of the property conveyed, may have been already, in part, paid by the trustees, in their exoneration. They are, therefore, estopped from disclaiming to be bound by this deed. They cannot claim under it, and yet disclaim it. If it is their deed for one purpose, it is. also for the other. We are also of opinion that the answers given to the other objections to this deed, equally apply in relation to the securities. Considering them, therefore, independently of their principal, which, however, the court is not bound to do, we are clearly of opinion, that there is no objection to the copy of the deed being given in evidence, and that the judgment of the general court in this particular is erroneous.
With respect to the character of the books of the treasury department, the court is of opinion, that as to the treasurer himself they are conclusive to charge him. In relation to very numerous transactions, between even private parties, mutually confided in by each other, it may be a matter of primary convenience and accommodation, that their books should, by consent, afford conclusive evidence. It may be vastly inconvenient at least that every particular item should be the subject of particular ^'litigation, and be open to parol, conflicting and contradictory testimony. It must, at least, be admitted, that such individuals may by common agreement, adopt those books as a standard in exclusion of all other- evidence. The convenience, if not necessity, of such a criterion, in the case before us, is entirely manifest. If would be of vast inconvenience to open all of the innumerable items existing on the books of the' treasury, to a particular litigation and scrutiny. Of this criterion, the officer - himself, at least, has no reason to complain. If he does the business himself or has faithful agents, he cannot possibly be injured. In addition to the considerations arising from mutual convenience, as aforesaid, it is also, in the opinion of the court, of great weight, that the treasurer is a sworn officer: that his books, are provided at public expense; that that officer is required to state his accounts frequently and distinctly to the General Assembly; and that his office, and consequently his books, are under the control of the executive council — Do all these precautions amount to nothing? Do they not speak the legislative sense, upon this subject, as strongly as positive words could do? Are not books taken under all these solemnities, more to be regarded than the mere private accounts of private and unsworn individuals? If in the case of Moody v. Thruston, 1 Stra. 481, a statement of balances made by commissioners under an act of parliament, was held to be conclusive evidence, even although one of the parties litigant had had no time allowed him to prove his accounts, much more ought the treasurer, under all the provisions and precautions of our laws, to be permitted to bind himself. If in the case of Stevens v. Coburn, 2 Call, 440, the certificate of the land commissioners was held to be final, and that even against an infant, much more ought Preston’s own certificate (if we may so express ourselvés) to be held to be final, against himself. It is of no account *that, in that case, the land law declared that the certificate should be final: There is no difference between an act containing such a declaration, and one affected by principles, and containing provisions, which irresistibly compel us to-come to a similar conclusion. — The establishment of these books as conclusive evidence, in such cases, while it deprives-that officer of a great advantage he would have over the commonwealth, if he were permitted by his clerks, or others, to falsify, in after times, his own items, solemnly entered by him in his books, is further called for by the necessity of acting by general rules, in such cases; and that policy is supported by several analogies in our laws. Under the provisions of the act for registering deeds, no man is permitted to aver an ignorance of a deed, which is duly recorded. So under the caveat law, no-man is allowed to aver his ignorance, that another had entered for the land in dispute, upon the books of the surveyor of the county; as was decided by the court of appeals, in the case of Noland v. Cromwell. Both these provisions go upon the ground of the general utility, if not necessity, of establishing general rules, in these cases; and of referring to public documents, which are accessible to all, instead of leaving every case in respect of evidence to stand on its own bottom. They are both wisely calculated to prevent frauds and perjuries, and to cut up and prevent infinite disputes and litigation. In these last cases particular mischiefs may, perchance, happen, but they are submitted to as the lesser of evils, and in favor of the general provisions of acts of great public convenience and utility. In relation to the treasurer, in the case-before us, no possible inconvenience can result to him, but from his own negligence- *919 or the corruption of his clerks. In the last case he must have his remedy over against them, or against those -who are responsible for them. If in the case of an ordinary deed or bond, a man is estopped to deny matters contained in such deed or bond, from the mere circumstance *of having annexed a scroll thereto, much more ought the treasurer to be concluded in the case before us. Being a sworn officer he ought to be bound by books rendered under that sanction; he ought to be bound by books solemnly kept by him, under all the checks and precautions too, established, by the wisdom of our laws. While there is no necessity for it, neither is the commonwealth in any condition, to defend herself, against innumerable claimants bringing perhaps, suspicious witnesses to invalidate the solemn entries made upon the books of the treasury. Ho conceivable degree of diligence on the part of the officers of the commonwealth could protect her interests, if these general criteria were to be departed from, and, an infinitude of litigation opened upon her.
"These books thus conclusive against the treasurer, are also conclusive against his sureties. If a judgment against him is to bind them, so also is the evidence on which that judgment is rendered. — In the case of Braxton executor of Claiborn v. Winslow and others, (1 Wash. 31, and Call’s manuscript reports more at large,) it was decided, that to fix the amount of an executor’s liability, the action must be brought against him, and that the recovery against him will bind his sureties. — It is also said in that case, that if A. agrees to pay B. what C. owes him, he cannot call upon A. until he establishes his demand in a suit against C. the proper party to defend the suit. So it was decided in the case of Greensides v. Benson, 3 Atkins, 248, that sureties are bound, as to the amount, by a judgment rendered against the principal: that it is immaterial if that judgment were even rendered without defence on the part of the principal, for that shews rather a consciousness that the principal had no defence to make. The court also decided in that case, that it would not take the whole account over again at the instance of the sureties and that the case of the sureties is not at all better; “for as the verdict *was found against the principal, who was the proper person to try it, it would be hard to have the same matter tried over again, in as many actions as the sureties please.” We entirely concur in this reasoning. Sureties are not to be permitted to try over again, cases already decided against the principal: ' nor, when tried against them in the first instance, to avail themselves of evidence which the principal himself would be inhibited from using.— These authorities are conclusive to shew that the sureties stand on a common foundation with the principal.
The counsel for the appellees have repeatedly told us, that as the amount of the defalcation was in issue between the parties, they ought to be allowed to prove that issue on their part. They ought not to be allowed to prove it, by any thing but legal testimony. Their position, in,the latitude in which it is taken, would equally go to let in hearsay testimony, or depositions not upon oath. The Judges ought not to surrender their province of inhibiting the introduction of illegal testimony. In the opinion of this court, the parol evidence offered by those who stand in the shoes of the Treasurer, to invalidate and set aside his books, is as inadmissible as the hearsay or unsworn testimony just mentioned.
The books of the treasury being thus held to be conclusive evidence, both as to the principal and the sureties, we come to apply them to the case before us. We readily admit that there ought to be separate bonds for each and every year, and that the Treasurer of every year, although, in fact, he be the same person, ought to be considered as if he were a different person.— When, in the case before us, the present Treasurer succeeded the late Treasurer in his office, and at the same time the latter had handed over his books to the former, shewing that a stated sum of money was in the public treasury, the former, however, was not bound by that statement. *His proper course was, to go into the treasury, with the late Treasurer, as in fact he did; to count the money, and see that the sum stated was there, and grant his receipt therefor. He might do this, or he might waive a count, and thus give his confidence, to his predecessor as to the amount of the money actually in the treasury. In the last case he would be estopped by this confidence, to say, that that money was not there. So also the present Treasurer might equally bind himself by his acts. His entering into the office, and omitting to make a count, would be held as a waiver thereof, an acknowledgment that the money stated, was actually in the treasury. This, also, was precisely the case with John Preston, at the commencement of his term of 1819, and considering his predecessor of the former year, as a different person. At that time, also, John Preston either counted the money and as it were gave his receipt for it, or gave his confidence that it was there. In neither case can he object, that the money stated was not in the treasury, at the commencement of his term of 1819. This doctrine holds a fortiori as to him, as he was also the former Treasurer. A man may, more readily give confidence to himself than to another, and there is less hardship in holding him to the consequences of it. John Preston might by calling a count of the money, at the commencement of his term of 1819, and finding a deficiency, have charged himself as for the year 1818, and discharged himself and his sureties for the year 1819; failing to do this, however, he has admitted himself to have the money in 1819, and he and his sureties for that year are consequently liable. The conclusion resulting from these principles is, that all the money stated in the books to be in the treasury in January 1819, is admitted to have been there, and that no parol evidence can be received to shew the contrary.
The foregoing opinion of the court in relation to the copy of the deed offered in evidence and rejected, makes *it *920 unnecessary for us to decide, Conclusively, upon the judgment of the General court, objected to in the first bill of exceptions. As however the original deed was proved by the appellant to have been in the hands of one of the appellees, as it was not known by the appellant to be elsewhere, and as the appellee, Francis Preston, no otherwise discharged himself from the custody thereof, than by his own verbal and unsworn statement; our present impressions are, that he ought to have been considered in the possession thereof, so as to let in the reading of the copy by the appellant, or at least to procure a continuance of the trial. Had such a continuance been moved for and rejected, that rejection would, in our opinion, have been clearly erroneous. We repeat, however, that we do not decide this question. It is unnecessary in this case to be decided.
The court is of opinion, that there is no error in so much of the opinion of the General court as sustained the demurrer to the third plea, and overruled the same; nor in overruling the motion of the appellants, to reject the second plea. The reasons in favor of these opinions of the court are so manifest that they need not be assigned.
The court coming more particularly to the judgments complained of in the 2d bill of exceptions tendered by the appellant, and bearing in mind the principles and reasons herein more particularly detailed in relation thereto, is of opinion, that the motion made by the appellant to exclude the evidence so as aforesaid adduced by the appellees from going to the Jury, as being inadmissible evidence, so far as the same was offered to exonerate the said appellees from responsibility for the balance of $83,099.30 appearing from the books and reports of John Preston, as Treasurer, to be due to the commonwealth at the time of his resignation, ought to have been sustained; and that the judgment of the General court overruling the said motion, and admitting the *said evidence to go to the Jury, is erroneous. The court is also of opinion, that the second motion of the appellant for the court to instruct the jury, that notwithstanding the facts proved by the appel-lees as aforesaid, the commonwealth was entitled to recover against them the said sum of $83,099 30 cents, (the deficit appearing on the Treasurer’s books as kept for the year 1819,) and also the several sums of $4,488 08 cents, $39,000, $5,48157, and $510, as is in the said bill of exceptions more particularly explained, ought to have been sustained' — 'Because the said several sums last mentioned, although not received in 1819, nor properly audited or entered on the Treasurer’s books, at the time when received, yet were entered in the bank to the credit of the said John Preston, as Treasurer of the commonwealth, and were reasonably to be regarded, as constituting a part of the $248,086 62 cents, turned over in bank by him to the appellant, upon his resigning his office. — The court is consequently of opinion that the judgment of the General court overruling the same, and declaring that the appellees were only liable for the due application by the said John Preston for the sum actually in the treas- | ury, at the commencement of his last term of office, and of the sums received by him during his said term, is erroneous. The reasons operating with the court, for coming to this conclusion, have been already sufficiently detailed. The court is also of opinion, that the money received in the bank by the present Treasurer from his predecessor, was a payment by the latter to the former for the use of the commonwealth, and having- been made without any specific direction as to the application thereof, the present Treasurer had a right to apply the same to the extinguishment of any balance due by him to the commonwealth which became due by consequence of not crediting the commonwealth with the same money on the treasury books; which money he had received as Treasurer, and *had passed to his credit as treasurer in bank, the payment being made with the same money in bank, which should have appeared to the credit of the commonwealth on the treasury books; — 'and that the judgment and instruction given to the jury, contrary to this position, is erroneous. — It is, therefore, the unanimous opinion of the court, that the said judgment of the General court is erroneous, and should be reversed. All the Judges concur not only in this conclusion, but also in all the points and principles now laid down — except that one Judge dissents from his brethren upon one point; and on that point will be pleased to express his own opinions. Therefore it is considered, that the said judgment be reversed and annulled, and that the appellant recover against the appellees the costs expended in the prosecution of the appeal aforesaid here. And it is ordered, that the Jury’s verdict be set aside, and the cause remanded to the said General court for further proceedings to be had; and on a further trial, that court will give the instructions now approved by this court, if required, and conform to the other principles laid down by the court, which is ordered to be certified to the General court.